

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York  10007*

January 21, 2008

**By Hand**

The Honorable Richard J. Sullivan
United States District Court
Southern District of New York
500 Pearl Street - Room 615
New York, New York  10007

    Re:    United States v. Carlos Pena Ontiveros and Silvestre Rico Beltran
               07 Cr. 804 (RJS)

Dear Judge Sullivan:

      The Government respectfully submits this letter in opposition to the defendants' motions to suppress physical evidence and post-arrest statements.  The Court held a hearing on the defendants' motions on December 3, 2007.  For the reasons set forth below, the defendants' motions should be denied.  The mutually consistent testimony of the six agents, along with Government exhibits 1 through 10, demonstrate beyond a preponderance of the evidence that: (1) Ontiveros provided oral consent to enter and search an apartment located at 516 Puglsey Avenue in the Bronx, New York (the "Apartment"); (2) there was probable cause to arrest both defendants; (3) Ontiveros provided oral and written consent to search the truck; and (4) the defendants' post-arrest statements were obtained in accordance with Miranda v. Arizona, 384 U.S. 436 (1966), and 18 U.S.C. § 3501.  In addition, the defendants' affidavits fail to establish that either of them has any interest in any of the items seized from the Apartment, and therefore neither one of them has standing to seek the suppression of these items.  Accordingly, the Court should deny the defendants' motions to suppress in their entirety.

**The Evidence At The Hearing**

      At the December 3, 2007 hearing, the Government called five witnesses:  Special Agents Mildred Marin, Stephen Lee, Eric Stowers and Brian Herbert of the Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), and Detective Robert Martinez of the Waterfront Commission of New York Harbor and a member of an ICE Task Force.  The defense

called one witness: Special Agent Richard Johnson of ICE. Neither defendant elected to testify.[1]

### A.     Pre-Arrest Surveillance

The testimony of Special Agents Marin, Lee and Johnson established the following: On July 22, 2007, at approximately 5:30 p.m., in the vicinity of 516 Pugsley Avenue in the Bronx, a team of ICE agents established surveillance of a white Ford pick-up truck with Texas license plates (the "truck"). Transcript of Suppression Hearing, December 3, 2007 ("Tr.") 11, 97, 268-69. The truck was parked across the street from the Apartment. Tr. 14, 97; Government Exhibit ("GX") 1A. At the time the agents established surveillance of the truck, they had learned that the truck was registered to "Carlos Pena" at a Texas address, and that the truck had crossed the U.S.-Mexico border approximately 8 to 10 times, including the most recent crossing on July 16, 2007. Tr. 16-17, 98.

Shortly after they established surveillance of the truck, the agents observed the two occupants of the truck, later identified as the defendants, get out of the truck, walk to a nearby park, and meet with two or three other individuals. Tr. 18, 101, 270. After the meeting, the defendants got into a cab, and drove away with one other individual. Tr. 101. Later that night, the defendants entered the Apartment, and the agents also observed other individuals enter and exit the Apartment over the course of the evening. Tr. 101. One of those individuals retrieved a bag from a car parked near the Apartment and brought the bag into the Apartment. Tr. 101.

At approximately 12:30 a.m., the agents observed defendant Ontiveros walk from the Apartment to the truck, retrieve a duffel bag from the passenger side of the truck, and return to the Apartment. Tr. 19, 102-03, 270. Later that morning, at approximately 3:00 a.m., a canine unit from the Port Authority Police Department conducted an external inspection of the truck.

---

[1]     Courts in this District and elsewhere have declined to credit a defendant's affidavit under circumstances such as these when the defendant did not testify at a hearing and other credible evidence undermined the defendant's assertions. See United States v. Juliano, 2000 WL 1206745, at *3 n.1 (S.D.N.Y. 2000) (Schwartz, J.) (rejecting conclusory statements in defendant's affidavit because defendant did not testify and was not subject to cross-examination, so district court could not form opinion about defendant's credibility, and testimony of law enforcement witnesses was "forthright and truthful"); United States v. Frank, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. 1998) (Cote, J.) (same); United States v. Rodriguez, 1993 WL 78060, at *2 (S.D.N.Y. 1993) (Wood, J.) (same); see also United States v. Gardner, 611 F.2d 770, 774 (9th Cir. 1980) (giving "greater weight to the testimony, which was subject to cross examination, than to the affidavits"). Another court has held that "an affidavit should be given little weight, if any, when government witnesses testify at suppression hearings and a defendant, who originally submitted the affidavit, does not." People of Guam v. Santos, 1999 WL 104499, at *4-5 (Sup. Ct. Guam 1999). The Santos Court further observed that "giving weight to an affidavit under these circumstances would allow assertions contained in the document to be considered without complete scrutiny as to disputed facts. At the same time, the credibility of the proponent would escape the close investigation that only examination by the opponent could bring." Id.

Tr. 20, 103, 271. During the inspection, the narcotics dog signaled an alert for the presence of narcotics by scratching in the area where the flatbed portion of the truck meets the cab area. Tr. 21, 104, 272. After the dog hit on the truck, the agents decided to attempt to obtain consent to search the truck and the Apartment. Tr. 21, 105, 274.

### B.    Entry and Search of the Apartment

At approximately 3:00 a.m., a group of agents approached the front door of the Apartment. Tr. 23, 106, 275. The agents were dressed in plain clothes, and at least some of them had their badges visible. Tr. 23, 107. None of the agents had their weapons drawn. Tr. 23, 107, 275. Upon reaching the front door, the agents began to knock and announced their presence in both English and Spanish. Tr. 24, 108. The agents continued to knock for approximately twenty minutes. Tr. 24, 109, 284. During this period, some agents walked to the rear of the Apartment and continued to knock, while other agents spoke to the landlord who lived next door. Tr. 24, 107-08, 279-84.

According to Special Agents Marin and Johnson, after approximately twenty minutes, Ontiveros opened the front door of the Apartment and spoke to Special Agent Marin in English. Tr. 24-25, 286. Special Agent Marin asked Ontiveros if the agents could enter the Apartment, and he said, "Yes." Tr. 25, 286, 288, 290. At that point, Special Agent Marin and a group of agents entered the Apartment. Tr. 25, 286, 288. Special Agent Marin then asked Ontiveros for consent to search the Apartment, and he provided consent. Tr. 25-26, 114. The agents then proceeded to search the Apartment. During the search, the agents found two kilograms of cocaine and approximately $96,000 in cash inside a trap in the hallway closet outside of the bedroom used by Beltran. In addition, the agents found other evidence of narcotics distribution, including a money counting machine, a heat sealing machine, and a scale. Tr. 29, 112.

During the search, the agents asked both defendants about the truck, and both defendants provided oral consent to search the truck. Tr. 111-12, 303. Special Agent Johnson and Special Agent Christopher McClellan then searched the truck but did not find any contraband. Tr. 112, 310.

After the discovery of the cocaine and the cash in the trap, the agents placed both defendants under arrest. Tr. 30, 115. Ontiveros was in the front of the Apartment and Beltran was in one of the bedrooms in the back of the Apartment. Tr. 109. Special Agent Lee read Ontiveros his Miranda rights in English from the Miranda waiver form, and Special Agent Carl DeFilippo served as a witness. Ontiveros then provided both oral and written waivers of his Miranda rights. Tr. 115-117; GX 10. The agents did not interview Ontiveros at that time. Tr. 117.

In the rear bedroom, Detective Martinez read Beltran his Miranda rights in Spanish from the Miranda waiver form, and Special Agent Stowers served as a witness. Tr. 201, 315. In response, Beltran provided an oral waiver of Miranda, telling Detective Martinez in Spanish he was willing to talk. Tr. 202, 318, 321-22. Beltran indicated, however, that he was not willing to provide a written waiver. Tr. 203, 318; GX 9. Special Agent Stowers then proceeded to

interview Beltran about the drugs, money and drug paraphernalia that were found in the Apartment, and Detective Martinez served as the interpreter. Tr. 205, 324. During the interview, Beltran denied any knowledge of any of the items recovered in the Apartment. Tr. 205.

At approximately 6:00 a.m., after collecting all of the evidence from the Apartment, the agents transported the defendants and the truck to the ICE office in Manhattan. Tr. 30, 117.

### C.     Interviews of the Defendants

Upon arrival to the office, Special Agent Lee interviewed each defendant separately for no more than five minutes each. Tr. 117-18. Special Agent Lee then arranged to have the truck inspected by Customs and Border Protection ("CBP") at its facility in Newark, New Jersey. Tr. 119. At approximately 7:30 a.m., Special Agent Lee obtained written consent to search the truck from Ontiveros. Tr. 119-20; GX 3. Special Agent Lee then provided the written consent form to Special Agents Brian Herbert and Dan Herbst, who drove the truck to Newark for inspection. Tr. 120.

While waiting for the results of the truck inspection, Special Agent Lee explained the right of speedy presentment to each defendant separately, and obtained oral and written waivers of speedy presentment from each of them. Tr. 122-24; GX 4-5. Special Agent Lee inadvertently had each defendant sign the waiver form related to the right to be presented in the nearest district, instead of the form related to the right of speedy presentment. Tr. 125.

According to Special Agent Herbert, the inspection of the truck by CBP began at approximately 10:30 a.m. on July 23, 2007, and continued until at least 6:00 p.m. Tr. 244. During the inspection, the CBP found approximately 8 kilograms of cocaine in two traps located inside the truck. Tr. 244. After the 8 kilograms were found, Special Agent Herbert informed the ICE agents back at the office, and he and Special Agent Herbst drove the truck and the drugs back to the office. Tr. 125, 245. They arrived back at the office at approximately 7:30 p.m. Tr. 245.

Upon learning of the 8 kilograms of cocaine in the truck, Special Agents Lee and Alfonso interviewed Ontiveros. Tr. 125. Before interviewing him, Special Agent Lee again advised Ontiveros of his Miranda rights in English, and again obtained both oral and written waivers of Miranda from him. Tr. 125-26; GX 6. Special Agents Lee and Alfonso then interviewed Ontiveros for approximately 45 minutes. Tr. 129. Special Agent Alfonso took notes during the interview. Tr. 128. At the end of the interview, Special Agent Alfonso instructed Ontiveros to review the notes to ensure that they were an accurate account of what Ontiveros had said, and if they were accurate, to sign the last page. Tr. 128. Ontiveros then reviewed the notes and signed the last page without making any changes. Tr. 128-29; GX 8.

After Special Agents Herbert and Herbst returned to the office and secured the truck and the drugs, they interviewed Beltran. Tr. 246. Before interviewing him, Special Agent Herbert understood that Beltran had previously waived his Miranda rights based upon his earlier conversations with other agents and his review of the case file. Tr. 246-47. At the beginning of

the interview, Special Agent Herbst advised Beltran of his Miranda rights in Spanish again, and obtained both oral and written waivers of Miranda from him. Tr. 248-51; GX 7. Special Agents Herbert and Herbst then interviewed Beltran for approximately 1 hour during which time he provided a detailed statement about his involvement in cocaine trafficking. Tr. 253.

Following the interviews, both defendants were transported to the Metropolitan Detention Center for overnight lodging, and were presented before a Magistrate Judge the next day. Tr. 130. Over the course of their interactions with the agents, both defendant were generally calm and cooperative. Tr. 28, 129, 184, 236, 325. Moreover, neither defendant ever asked to speak with an attorney and neither defendant was ever threatened or coerced. Tr. 28, 129, 151, 326.

## Argument

### A.  The Defendants Do Not Have Standing To Move To Suppress The Items Found In The Apartment

As an initial matter, the defendants' attempt to suppress the items found in the Apartment fails because they cannot demonstrate that they had a reasonable expectation of privacy in the Apartment or the items.

The defendant bears the burden of proving standing to challenge the search of the Apartment. Rawlings v. Kentucky, 448 U.S. 98, 104-05 (1980). The Supreme Court in Rakas v. Illinois, 439 U.S. 128 (1979), recognized that Fourth Amendment rights are personal and may not be asserted vicariously. Accordingly, a defendant's Fourth Amendment rights are violated "only when the challenged conduct invaded *his* legitimate expectation of privacy rather than that of a third party." United States v. Payner, 447 U.S. 727, 731 (1980) (emphasis in original). The cornerstone of the modern law of searches is the principle that, to mount a successful Fourth Amendment challenge, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched." Minnesota v. Carter, 525 U.S. 83, 88 (1998); see also United States v. Fields, 113 F.3d 313, 322 (2d Cir.1997) ("The ultimate focus of Fourth Amendment analysis remains whether the defendant had a reasonable expectation of privacy in the place searched.").

A defendant must also show "that his expectation [of privacy] is reasonable, i.e. one that has a 'source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" Carter, 525 U.S. at 88 (quoting Rakas, 439 U.S. at 143 n. 12); see United States v. Haqq, 278 F.3d 44, 47 (2d Cir. 2002). Thus, "one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude." Rakas, 439 U.S. at 143 n. 12.

"A defendant lacks 'standing' in the Fourth Amendment context when his contacts with the searched premises are so attenuated that no expectation of privacy he has in those premises could ever be considered reasonable." Fields, 113 F.3d at 320. "[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the

-5-

consent of the householder may not." Carter, 525 U.S. at 90; see also Minnesota v. Olson, 495 U.S. 91, 91-100 (defendant had a privacy interest in apartment as an invited guest of the owner, who had given defendant permission to stay in the apartment); United States v. Osorio, 949 F.2d 38 , 41 (2d Cir. 1991) (defendant had a privacy interest in apartment as an overnight guest when the defendant testified that he had been invited to sleep at the apartment by the owner and the defendant was in fact found sleeping at the time the police arrived).

      The defendants have alleged nothing that would allow the Court to find that they had a legitimate expectation of privacy in the Apartment. Neither defendants claims to live in the Apartment; rather, defendant Beltran claims to be an overnight guest which, in his view, satisfies the standing requirement. (December 31, 2007 Beltran Aff. at 1; December 31, 2007 Beltran Brief ¶ 3; January 4, 2008 Ontiveros Brief at 2). Despite being afforded the opportunity to submit a supplemental affidavit, defendant Ontiveros has not done so. Accordingly, since it is unsupported by so much as a sworn statement, Ontiveros' claim of overnight guest status (set forth in his post-hearing brief) is insufficient to overcome the Fourth Amendment's standing requirement.

      Defendant Beltran's affirmation, in and of itself, is insufficient to establish that he had standing to contest the validity of the search at the Apartment. A person may only claim the protection of the Fourth Amendment by demonstrating "that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable" Minnesota v. Carter, 525 U.S. at 87- 91 (defendants have no reasonable expectation of privacy in apartment premises used solely for purposes of packaging cocaine); see also Katz v. United States, 389 U.S. 347, 351 (1967) (Fourth Amendment protection applies to what "he [the defendant] seeks to preserve as private").

      In fact, the overwhelming and incontrovertible evidence is that the defendants were members of a drug crew using the Apartment as a "stash house" to package and store cocaine and drug proceeds. The defendants' standing argument is therefore squarely foreclosed by the Supreme Court's holding in Minnesota v. Carter that persons in another's apartment for a short time for the business purpose of packaging drugs had no legitimate expectation of privacy in that apartment. 525 U.S. at 88 (citing Rakas v. Illinois, 439 U.S. at 143); accord United States v. Perez, 280 F.3d 318, 337-38 (3d Cir. 2002) (same). Since the defendants cannot establish any legitimate expectation of privacy in the Apartment, they lack standing to contest the search.

      Beltran's claim to the protections of Fourth Amendment as an overnight guest is unavailing. Although an overnight guest may be entitled to the protections of the Fourth Amendment, Beltran has failed to point to evidence that establishes that he was, in fact, an overnight guest. Unlike Olson and Osorio, where there was evidence that the defendants had been invited to spend the night at the subject premises with the consent of the owners, here there is no such evidence. The only evidence to support Beltran's overnight guest claim is that Beltran was inside the Apartment at approximately 3:00 a.m., a time when most people are asleep. Common sense suggests, however, that international drug traffickers do not keep such regular hours. Indeed, (1) the agents' surveillance of a meeting in the park across the street from the Apartment earlier in the evening; (2) the comings and goings of people in the vicinity of the

Apartment prior to the search; (3) the fact that the owner of the Apartment was not inside the Apartment at 3:00 a.m.; and (4) the fact that the defendants were awake at 3:00 a.m. suggests that the defendants were simply waiting for the arrival of one of their co-conspirators to provide payment for their delivering eight kilograms of cocaine to the Apartment. As such, defendants were only fleeting guests of the owner of the Apartment, who did not have a privacy interest in the Apartment.

Even if the Court were to find that the defendants were invited overnight guests, however, the defendants had no privacy interest in the 2 kilograms of cocaine and approximately $96,000 found in the hidden compartment in the Apartment's hallway closet and therefore have no standing to suppress those items. Decisional law is clear that defendants are not entitled to assert privacy protections for areas of the home for which they do not have access. United States v. Osorio, 949 F.2d 38 , 41 (2d Cir. 1991) ("A guest cannot have even a subjective expectation of privacy in those areas of the host's home that are off limits to the guest or of which the guest has no knowledge."). The defendants have not alleged that they knew about, or had access to, the hidden compartment in the hallway closet. The defendants have not alleged that they used the hallway closet at all; nor is there evidence suggesting that their belongings were in the hallway closet. Therefore, it is plain that the defendants had no privacy interest in the 2 kilograms of cocaine and approximately $96,000 found inside the hidden compartment in the hallway closet. Accordingly, defendants have no standing to seek the suppression of those items.

  **B.**  **The Entry And Search Of The Apartment Was Lawful Because Defendant Ontiveros Provided The Agents With Consent**

Both defendants claim that the agents' entry into the Apartment was unlawful because it was based upon a ruse. They claim that the agents tricked them into opening the front door by having a female agent ask to use the bathroom. (Ontiveros Affidavit at ¶ 1; Beltran Affidavit at ¶ 4).[2] The defendants claim that the agents then entered the Apartment and began to search it. (Ontiveros Affidavit at ¶ 1; Beltran Affidavit at ¶ 5). These claims are utterly false. The evidence at the hearing convincingly demonstrates that the agents obtained Ontiveros's consent to enter and search the Apartment. Accordingly, the defendants' motions to suppress a money counter, a heat sealing machine, two kilograms of cocaine and $95,960 in cash from a trap in a hallway closet should be denied.

It is well-settled that a warrantless search may be conducted based upon the consent of an authorized third party. See United States v. Matlock, 415 U.S. 164, 171 (1974); Koch v. Town of Brattleboro, 287 F.3d 162, 167 (2d Cir. 2002); United States v. Deutsch, 987 F.2d 878, 883 (2d Cir. 1993). Consent to search a premises may be given by a third party who possesses "common authority over or other sufficient relationship to the premises sought to be inspected." Matlock, 415 U.S. at 171. A third party has the requisite "common authority" if he has joint access to, or control of, the property for most purposes. Id. at n.7. The Second Circuit has held

---

  [2]  Surprisingly, during the hearing defense counsel for the defendants failed to ask one cross-examination question regarding the alleged "bathroom" ruse their clients allege led to the agents' entry into the Apartment.

that "a third party consent to a search will validate the search if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." United States v. Davis, 967 F.2d 84, 87 (2d Cir. 1992) (McLaughlin, J.), cert. denied sub. nom, Content v. United States, 506 U.S. 928 (1992) (holding that consent of co-conspirator to search a footlocker extended to closed containers inside the footlocker belonging to defendant) (relying upon Florida v. Jimeno, 500 U.S. 248, 251 (1991)).

      Consent, which may be express or implied, is a voluntary waiver of Fourth Amendment rights, and the waiver need not necessarily be knowing and intelligent. See Schneckloth v. Bustamonte, 412 U.S. 218, 235, 241 (1973); United States v. Garcia, 56 F.3d 418, 422-23 (2d Cir. 1995). To determine whether consent was voluntarily given, courts examine the totality of the circumstances surrounding the consent. Schneckloth, 412 U.S. at 227; Garcia, 56 F.3d at 423; United States v. Puglisi, 790 F.2d 240, 243 (2d Cir. 1986). The relevant factual inquiry is guided by an "objective standard," and the ultimate question is whether "the officer had a reasonable basis for believing that there had been consent to the search." Garcia, 56 F.3d at 423; see also Jimeno, 500 U.S. at 251 ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

      Here, the record is clear that Ontiveros had access to and common authority over the Apartment. Ontiveros was in the Apartment along with Beltran at the time of the agents' entry and he exerted control over the entire Apartment at that time. The defendants do not contest that, as a third party guest, Ontiveros could not consent to a search of the Apartment. The record is likewise clear that Ontiveros knowingly gave Special Agent Marin oral consent to search the Apartment when she asked. (Tr. 53, 54). Ontiveros was clearly aware that he could refuse entry to the agents, which is demonstrated by his refusal to answer the door for approximately twenty minutes prior to consenting to the search. The agents did not coerce or threaten Ontiveros into providing consent: none of the agents had their guns drawn, cursed, or raised their voices to Ontiveros. (Tr. 23-24 (guns); 27-28 (voice level); 54-55 (cursing)). Accordingly, the defendants motion to suppress the items found in the Apartment should be denied.

      **C.**    **There Was Probable Cause to Arrest Both Defendants**

      Both defendants claim that the agents did not have probable cause to arrest them. (November 2, 2007 Ontiveros Brief at 7-8; November 2, 2007 Beltran Brief at 7). Their claims simply ignore the totality of the facts and circumstances known to the agents prior to the arrests. The mutually consistent testimony of the agents clearly establishes that there was probable cause to arrest both defendants for narcotics distribution. Accordingly, their claims should be denied.

      A warrantless arrest is fully justified if there is "probable cause when the defendant is put under arrest to believe that an offense has been or is being committed." United States v. Cruz, 834 F.2d 47, 50 (2d Cir. 1987). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or

is being committed (2) by the person to be arrested." United States v. Fisher, 702 F.2d 372, 375 (2d Cir. 1983); accord United States v. Ceballos, 812 F.2d 42, 50 (2d Cir. 1987). To establish probable cause, "it is not necessary to make a prima facie showing of criminal activity or to demonstrate that it is more probable than not that a crime has been or is being committed." Cruz, 834 F.2d at 50 (quotation omitted). Rather, probable cause merely requires a "fair probability" under the "totality of the circumstances" that the defendant to be arrested has committed a crime. Illinois v. Gates, 462 U.S. 213, 238 (1983). It "is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Maryland v. Pringle, 124 S. Ct. 795, 799 ( 2003) (quotations omitted).

The Second Circuit has held that probable cause to search or to arrest may be established based solely upon a positive alert by a dog trained in narcotics detection who has proven reliable in the past. See United States v. Glover, 957 F.2d 1004, 1013 (2d Cir. 1992); United States v. Waltzer, 682 F.2d 370, 372 (2d Cir. 1982), cert. denied, 463 U.S. 1210 (1983) ("Where designation by a dog with a record of accuracy occurs, therefore, we hold that probable cause has been established as to the person possessing the luggage.") (citing United States v. Johnson, 660 F.2d 21 (2d Cir. 1981) and United States v. Bronstein, 521 F.2d 459 (2d Cir. 1975), cert. denied, 424 U.S. 918 (1976)).

Based on the foregoing, it is clear from the evidence in the record that the agents had probable cause to arrest both defendants. It is a crime under Federal law to possess narcotics and to possess narcotics with the intent to distribute them. See United States Code, Title 21. The testimony of Special Agents Marin, Lee and Johnson establishes that it was entirely reasonable for the agents to conclude that there was a "fair probability under the totality of the circumstances" that the defendants had committed a drug-related crime.

Before establishing surveillance of the truck in the vicinity of 516 Pugsley Avenue in the Bronx, the agents knew the following: (1) the truck was registered to "Carlos Pena" at a Texas address near the U.S.-Mexico border; (2) the truck had previously crossed the U.S.-Mexico border 8 to 10 times; and (3) the truck last crossed the border one week earlier on July 16, 2007.

During their surveillance of the truck and the surrounding area, the agents observed the following: (1) the defendants got out of the truck and met with two or three individuals in a nearby park; (2) the defendants then got into a taxi with one of those individuals and left the area; (3) the defendants and others later returned to the Apartment; (4) various individuals were coming and going from the Apartment over the course of the evening; (5) one of those individuals retrieved a bag from a car parked near the Apartment and brought the bag into the Apartment; (6) at approximately 12:30 a.m., Ontiveros walked from the Apartment to the truck, retrieved a duffel bag from the passenger side of the truck, and returned to the Apartment; and (7) at approximately 3:00 a.m., the trained narcotics-detection dog alerted to the presence of narcotics in the truck. Notwithstanding this compelling set of facts suggesting that the defendants were involved in narcotics trafficking, the agents did not arrest the defendants at this time; instead, they decided to attempt to obtain consent to search the truck and the Apartment.

After the agents obtained consent to enter and to search the Apartment, the defendants were not placed under arrest. Some of the agents spoke to the defendants while other agents searched the Apartment. At this time, both defendants provided consent to search the truck. During the search of the Apartment, the agents found two kilograms of cocaine and approximately $96,000 in cash inside a trap in the hallway closet located outside of the bedroom used by Beltran. In addition, they found additional evidence of narcotics distribution, including a money counter, a heat sealing machine, and an electronic scale in different areas of the Apartment. It was only after the discovery of the 2 kilograms of cocaine, the approximately $96,000 in cash, and the other drug paraphernalia in the Apartment that the agents placed the defendants under arrest.

The totality of the circumstances, which includes the information about the truck, the agents' observations during surveillance, the dog hit, and the drugs, cash and paraphernalia found in the Apartment, fully supports the agents' conclusion that there was a fair probability that the defendants had committed narcotics-related crimes, and that their arrest in the Apartment was necessary. Simply put, the defendants' claims that there was no probable cause to arrest are clearly belied by the facts, and should be denied.

> D.  **The Searches of the Truck Were Lawful Because Defendant Ontiveros Provided the Agents with Oral and Written Consent**

The defendants also move to suppress the eight kilograms of cocaine found in the hidden compartments in the truck. Ontiveros contends that the agents "forced" him to provide written consent to search the truck. (Ontiveros Affidavit at ¶ 1). Contrary to Ontiveros's claim, the evidence at the hearing demonstrates that Ontiveros provided both oral and later written consent to Special Agent Lee to search the truck, and that Beltran also provided oral consent to Special Agent Johnson to search the truck. Since any one of these statements of consent is sufficient to overcome the warrant requirement for a search, the defendants' motions to suppress the eight kilograms of cocaine found in the truck should be denied.

As discussed in Section B above, a warrantless search is proper pursuant to a voluntary waiver in the form of consent. As with the consent to search the Apartment, it is clear that Ontiveros had authority and control over the truck. Agents had seen both Ontiveros and Beltran exit the truck on the evening of July 22nd. Likewise, Ontiveros and Beltran both had access to the truck. Special Agent Lee testified that, shortly after his entry into the Apartment, he spoke with Ontiveros about the truck. During this discussion, Ontiveros told Special Agent Lee in English that the truck was his; that there were no guns, drugs, or money in the truck; and that Special Agent Lee had permission to search the truck. (Tr. 111-12). Special Agent Johnson also testified that he had a very similar conversation with Beltran in which Beltran told Special Agent Johnson that the truck was his and that Special Agent Johnson had permission to search it. (Tr. 303). This testimony was essentially unchallenged during the hearing. After the defendants had been given and waived their Miranda rights and were transported back to ICE headquarters, Special Agent Lee had another discussion with Ontiveros at approximately 7:30 or 8:00 a.m. During this discussion, Ontiveros signed a consent to search form providing written consent to search the truck. (Tr. 119-20; GX-3). Defendants point to no evidence to suggest that Ontiveros was

coerced or threatened into signing this waiver; indeed, there is no such evidence.  In short, in the absence of any evidence challenging the testimony of Special Agents Lee and Johnson on this issue, defendants' motions to suppress the eight kilograms of cocaine found during the search of the truck should be denied.

> **E.     The Post-Arrest Statements of Both Defendants Were Made Knowingly, Voluntarily, and Intelligently, and Were Not Coerced**

Both defendants claim that the agents continued to question them after they repeatedly asked for an attorney, and therefore their post-arrest statements were obtained in violation of Miranda and should be suppressed.  (Ontiveros Affidavit at ¶ 1; Beltran Affidavit at ¶ 7).  These claims find no support in the record, and should be swiftly rejected.  Both defendants were advised of their Miranda rights when they were arrested at the Apartment, and then again at the ICE office before they were interviewed more extensively.  In both instances, they voluntarily, knowingly, and intelligently waived their rights, never invoked their right to counsel, and were not threatened or coerced in any manner.

In general, a defendant's statements made during custodial interrogation are not admissible against him for use in the Government's case-in-chief, unless the Government can prove that, prior to questioning, the defendant was "warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  For the Government to introduce a defendant's incriminating statement, the Government must generally prove that the accused waived his Miranda rights voluntarily, knowingly, and intelligently.  Id. at 475.  In determining whether a Miranda waiver is valid, the Court is free to consider the "totality of the circumstances surrounding the interrogation."  Moran v. Burbine, 475 U.S. 412, 421 (1986).  A written waiver of rights is not required.  United States v. Spencer, 955 F.2d 814, 819 (2d Cir. 1992).  Nor is it necessary for a person to be aware of the consequences of being questioned for a waiver of Miranda rights to be knowing and intelligent.  California v. Beheler, 463 U.S. 1121, 1125 n.3 (1983).  The Government must prove waiver by a preponderance of the evidence.  See Colorado v. Connelly, 479 U.S. 157, 168 (1986).

The mutually consistent testimony of the agents who interviewed the defendants establishes by a preponderance of the evidence that each defendant waived his Miranda rights voluntarily, knowingly, and intelligently on two different occasions: once at the Apartment, and then again at the ICE office.  Moreover, the testimony of the agents is corroborated by the four Miranda forms from which the agents read each time they advised the defendants of their rights.  GX 6-7, 9-10.  Special Agent Lee's testimony and Government Exhibits 6 and 10, both of which contain Ontiveros's initials next to each statement of his rights as well as his signature in the waiver section, make it clear that Ontiveros understood his Miranda rights, and voluntarily waived them on both occasions.  Ontiveros's voluntary waiver finds further support in Government Exhibit 8, the handwritten notes of his interview taken by Special Agent Alfonso that Ontiveros reviewed and then approved with his signature.  In total, Ontiveros signed five documents following his arrest:  the two Miranda waiver forms, the notes of his interview, the consent form for the truck, and the form intended to memorialize his waiver of speedy

presentment. These five signatures support the agents' testimony that Ontiveros was entirely cooperative from the moment he opened the door and spoke to Special Agent Marin, and completely undermine his unsupported claims that he repeatedly asked to speak to a lawyer and was coerced.

Similarly, the testimony of Special Agents Stowers and Herbert, and Detective Martinez, along with Government Exhibits 7 and 9, demonstrate by a preponderance of the evidence that Beltran provided an oral waiver of Miranda at the Apartment, and then an oral and a written waiver at the ICE office. Both Special Agent Stowers and Detective Martinez testified that: (1) at the Apartment, Detective Martinez advised Beltran of his Miranda rights in Spanish from the waiver form and Special Agent Stowers served as a witness; (2) Beltran replied in Spanish that he was willing to talk but not willing to provide a written waiver; and (3) Special Agent Stowers then proceeded to interview Beltran with Detective Martinez serving as an interpreter. This mutually consistent testimony is corroborated by Government Exhibit 9, the Miranda waiver form which contains the names of both interviewing agents and indicates that Beltran refused to sign. As Special Agent Stowers explained, if Beltran had not provided an oral waiver or had invoked his right to counsel, the agents would not have filled out the waiver form and indicated that he refused to sign it.[3] Tr. 215-16.

Later that day, however, Beltran provided both an oral and a written waiver, as Special Agent Herbert testified. Special Agent Herbert, along with Special Agent Herbst, who speaks Spanish, interviewed Beltran at the ICE office. Prior to the interview, Special Agent Herbst advised Beltran of his Miranda rights in Spanish from the written waiver form. According to Special Agent Herbert, Beltran was "deliberate" in his review of the form before he initialled and signed it. Tr. 250; GX 7. Moreover, at no time did Beltran ever say he refused to sign the form or ask to speak to an attorney. Tr. 251. The agents then proceeded to interview Beltran for approximately one hour, during which time he provided an extensive oral statement regarding his drug-related activities.

Accordingly, it is evident from the interviewing agents' testimony and the supporting exhibits that each defendant was advised of his Miranda rights on two separate occasions,

---

[3] Even if the Court were to determine that Beltran was not properly advised of his Miranda rights at the Apartment, his statements made later in the day at the ICE office should not be suppressed because the record establishes that the statements were made voluntarily following an oral and a written waiver of Miranda, and the agents did not employ any deliberate, improper strategy to obtain the statements. See Missouri v. Seibert, 542 U.S. 600, 622 (2004) (holding that a defendant's post-Miranda confession that is obtained by a deliberate two-step interrogation method employed by law enforcement to undermine Miranda should be suppressed); Oregon v. Elstad, 470 U.S. 298, 318 (1985) (holding that a defendant's post-Miranda confession is admissible even if preceded by unwarned and voluntary incriminating statements so long as the confession is provided voluntarily); United States v. Carter, 489 F.3d 528, 535-37 (2d Cir. 2007) (joining other circuits in holding that Seibert lays out an exception to Elstad for cases in which law enforcement uses a deliberate two-step strategy to undermine Miranda and obtain a post-warning confession).

ensuring that each defendant understood their rights before electing to waive them. In both instances, as the four different waiver forms demonstrate, each defendant voluntarily, knowingly, and intelligently waived his rights. Finally, contrary to the defendants' baseless claims, neither of them ever invoked their right to counsel, and neither of them were threatened or coerced in any manner. Thus, the defendants' motions to suppress their post-arrest statements should be denied.

**E.      The Waiver Of Speedy Presentment Was Lawfully Obtained**

Both defendants claim that the agents coerced them into providing a written waiver of speedy presentment. (Ontiveros Affidavit at ¶ 1; Beltran Affidavit at ¶ 10). Like the defendants' other claims, this final claim is meritless. Each defendant was separately advised of his right to speedy presentment at the ICE office, and each defendant voluntarily, knowingly, and intelligently waived his right both orally and in writing. Moreover, the defendants' waiver of speedy presentment, coupled with all of the other evidence presented at the hearing, demonstrates that the delay in presenting the defendants until the day after their arrests was entirely reasonable under the circumstances.

Under 18 U.S.C. § 3501(c), a court may suppress a defendant's confession if that confession was made during interrogation conducted more than six hours after the defendant was arrested, and the delay in bringing the defendant before a magistrate or other judicial officer beyond the six-hour period was unreasonable under the circumstances. See United States v. Fullwood, 86 F.3d 27 (2d Cir. 1996); United States v. Perez, 733 F.2d 1026, 1030 (2d Cir. 1984). A defendant may waive his right to be presented promptly, and the waiver is a factor to be considered in determining whether the delay in presentment was reasonable under Section 3501(c). See United States v. Collins, 462 F.2d 792, 795-96 (2d Cir. 1972) (holding that 21 hours between arrest and confession did not constitute "unnecessary delay" when majority of time was spent in transit, routine processing, and overnight lodging); United States v. Ospina, 2000 WL 37997, *2 (S.D.N.Y. Jan. 18, 2000). As with a waiver of Miranda, the Government must prove by a preponderance of the evidence that the waiver of speedy presentment was voluntary, knowing and intelligent. See Colorado v. Connelly, 479 U.S. 157, 168 (1986).

Special Agent Lee testified that he explained the right of speedy presentment to each defendant separately at the ICE office while waiting for the results of the truck inspection. After their right to speedy presentment was explained, each defendant provided both an oral and a written waiver. GX 4-5. While Special Agent Lee inadvertently had each defendant sign the incorrect waiver form, there is absolutely no evidence that the speedy presentment waivers were the product of any threats or coercion. Tr. 125. As with the Miranda waiver forms and the consent to search the truck form, Special Agent Lee explained the right of speedy presentment to both defendants, and each of them continued to be cooperative and signed the waiver forms.

Special Agent Lee sought a speedy presentment waiver from the defendants because he understood that the defendants had a right to be presented before a judge on the day of their arrest. Tr. 145. As Special Agent Herbert explained, the inspection of the truck took several hours, and it was not completed until approximately 6:00 p.m., well after the presentment

-13-

deadline for that day. Accordingly, because the agents believed the truck contained narcotics based on the dog hit and the defendants had been generally cooperative throughout the day, the agents sought speedy presentment waivers in order to obtain some additional time to continue their investigation. This was entirely appropriate under the circumstances, and there is nothing in the record to suggest that the waivers were obtained improperly or that the delay in presenting the defendants was unreasonable. Therefore, the defendants' speedy presentment claims should also be denied.

### Conclusion

The evidence at the hearing demonstrates beyond a preponderance of the evidence that: (1) the entry and search the Apartment were lawful; (2) there was probable cause to arrest both defendants; (3) the searches of the truck were lawful; and (4) the defendants' post-arrest statements were obtained in accordance with Miranda and 18 U.S.C. § 3501. In addition, neither defendant has standing to seek the suppression of the items recovered from the Apartment in which they were overnight guests. Accordingly, the defendants' motions seeking the suppression of physical evidence and their post-arrest statements should be denied in their entirety.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:  /s/
Brendan R. McGuire/Michael Q. English
Assistant United States Attorneys
(212) 637.2220/2594

cc:   Cristobal M. Galindo, Esq.
      Counsel to Ontiveros
      (via fax)

      Carlos A. Garcia, Esq.
      Counsel to Beltran
      (via fax)