UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

Nº 07 Cr. 804 (RJS)
_____

UNITED STATES OF AMERICA,

AGAINST

CARLOS PEÑA ONTIVEROS, AND SILVESTRE RICO BELTRAN,

Defendants.

_____

MEMORANDUM AND ORDER
April 9, 2008
_____

RICHARD J. SULLIVAN, District Judge:

Defendants Carlos Peña Ontiveros and Silvestre Rico Beltran move for the suppression of (1) statements made by defendants at the scene of their arrest and while in custody on or about July 23, 2007; and (2) physical evidence recovered from the residence in which defendants were arrested and from the truck parked outside the residence. For the reasons stated below, defendants' motions are granted in part and denied in part.

## I. BACKGROUND

The indictment in this case charges defendants with conspiracy to distribute narcotics pursuant to 21 U.S.C. § 846, arising out of activity that occurred "in or about July 2007." (Indict. ¶ 1.) Specifically, the indictment alleges that, in furtherance of the conspiracy, defendants participated in transporting approximately seven kilograms of cocaine to the Bronx on or about July 22, 2007. (Indict. ¶ 3(a).)

On November 2, 2007, defendants filed motions to suppress physical evidence and statements made by each of the defendants on or about July 23, 2007. Specifically, Peña Ontiveros moves to suppress (1) approximately seven kilograms of cocaine found in a truck outside 516 Pugsley Avenue in the Bronx, the residence in which the

defendants were arrested (the "residence"); (2) statements made to the Immigration and Customs Enforcement ("ICE") agents regarding cocaine trafficking between Texas and New York; and (3) approximately $96,000 in U.S. currency and two kilograms of cocaine found inside a hidden compartment in a closet at the residence. (Peña Ontiveros Motion at 1.) Rico Beltran moves to suppress (1) all written and oral statements made at or subsequent to his arrest on July 23, 2007; (2) any and all "tangible things" seized from him; and (3) "testimony of any law enforcement officers, agents, and all other persons working in connection with such officers and agents, and all persons present at or near the location of the arrest" of Rico Beltran. (Rico Beltran Motion at 4.)

On December 3, 2007, the Court held an evidentiary hearing on defendants' motions. The government called five witnesses: ICE Special Agents Mildred Marin, Stephen Lee, Eric Stowers, and Brian Herbert, as well as Detective Robert Martinez, a member of the ICE Task Force. Defendants called one witness, ICE Special Agent Richard Johnson. Certain other agents were present at the scene of the arrests and/or the ICE office in Manhattan (the "ICE Office"), including Special Agents Michael Alfonso, Carl DeFilippo, Dan Herbst, and Christopher McClellan, but they did not testify. Neither defendant testified at the hearing.

The parties were given until January 4, 2008 to file any supplemental briefs. Both defendants submitted supplemental materials, and the government filed its supplemental opposition papers on January 21, 2008. The Court held oral argument on the motions on February 7, 2008.

## II. DISCUSSION

### A. Suppression of Physical Evidence

#### 1. Standing

As a threshold matter, the government argues that, with respect to the items found in the residence, defendants have not demonstrated the legitimate reasonable expectation of privacy required to make a suppression motion under the Fourth Amendment. (*See* Gov't Supp. Mem. at 5-7.) Defendants respond that they have established the requisite privacy interest in the premises because they were overnight guests. (*See* Peña Ontiveros Aff. at 1; Rico Beltran Aff. at 1.)

"The Fourth Amendment proscribes all unreasonable searches and seizures, and it is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (internal citations and quotation marks omitted); *see United States v. Kiyunyung*, 171 F.3d 78, 83 (2d Cir. 1999). However, "a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla,* 508 U.S. 77, 81 (1993) (emphasis in original); *see also United States v. Paynor*, 447 U.S. 727, 731 (1980). As such, an individual challenging the constitutionality of a search bears the burden of demonstrating a legitimate expectation of privacy in the particular area searched in order to proceed in challenging evidence recovered in a search. *See*

*Minnesota v. Carter*, 525 U.S. 83, 87-88 (1998); *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980); *Rakas v. Illinois*, 439 U.S. 128, 133-39 (1978); *United States v. Watson*, 404 F.3d 163, 166 (2d Cir. 2005). A person asserting a legitimate expectation of privacy in the object of a search or seizure must establish two elements: (1) a subjective expectation of privacy in the object, and (2) a willingness on the part of society to recognize that expectation as legitimate. *California v. Ciraolo,* 476 U.S. 207, 211 (1986).

Where it has been shown that an individual was an overnight guest in a home, that fact alone is enough to demonstrate that the individual had a legitimate expectation of privacy in the premises. *Minnesota v. Olson*, 495 U.S. 91, 96-97 (1990); *see United States v. Snype*, 441 F.3d 119, 130 (2d Cir. 2006); *Czernicki v. United States*, 270 F. Supp. 2d 391, 394 (S.D.N.Y. 2003). However, "that expectation will not always extend to the entire premises." *United States v. Osorio*, 949 F.2d 38, 41 (2d Cir. 1991). "A guest can not have even a subjective expectation of privacy in those areas of the host's home that are off limits to the guest or of which the guest has no knowledge." *Id.* (citing *Olson*, 495 U.S. at 99). Put another way, a defendant cannot deny knowledge or ownership of items on one hand, and claim a privacy interest in them on the other. *See Gudema v. Nassau County*, 163 F.3d 717, 722 (2d Cir. 1998) (citing *United States v. Torres,* 949 F.2d 606, 608 (2d Cir. 1991) and *United States v. Lee*, 916 F.2d 814, 818 (2d Cir. 1990)); *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987) (citing *Rawlings*, 448 U.S. at 105); *United States v. Cody*, 434 F. Supp. 2d 157, 167 (S.D.N.Y. 2006); *see also United States v. Cruz*, 475 F. Supp. 2d 250, 258 (W.D.N.Y. 2007) ("[The

defendant] cannot distance himself from any connection to the locked refrigerator while simultaneously arguing that he had a reasonable expectation of privacy in its contents.").

Here, the evidence establishes that defendants were overnight guests in the residence. Both have claimed that they were guests of the owner in their affidavits, and Rico Beltran expressly asserts that he was an overnight guest. (Peña Ontiveros Aff. at 1; Rico Beltran Aff. at 1.) The agents entered the residence and the arrests were made in the early morning hours of July 23, 2007, a time when most people are asleep. (*See* Transcript of December 3, 2007 Hearing ("Tr.") at 142-43; 274-75, 332.) One of the defendants was found in bed, and only partially dressed. (*Id.* at 289, 306.) One of the defendants was seen bringing a duffel bag into the residence, and a duffel bag belonging to Rico Beltran was found in the bedroom where he was found. (*Id.* at 20, 66-67, 101, 234-35.) Furthermore, one of the defendants possessed a key to the residence, which he gave to the agents so that they could lock up the residence when they left. (*Id.* at 338, 342); *see also United States v. Fields*, 113 F.3d 313, 320 (2d Cir. 1997). These facts demonstrate that defendants were overnight guests in the residence and thus had a legitimate expectation of privacy in the residence.

In addition, the Court finds that because defendants were overnight guests, defendants' expectation of privacy extended to all of the rooms of the residence, including those in which the agents found some of the challenged evidence — namely, the money counting machine, the plastic baggies, and the scale. (*See* Gov't Mem. at 2-3; *see* Tr. at 294-

96); *cf. Olsen*, 495 U.S. at 99 ("It is unlikely that the guest will be confined to a restricted area of the house; and when the host is away or asleep, the guest will have a measure of control over the premises."). As such, defendants have demonstrated a legitimate expectation of privacy sufficient to make a suppression motion with respect to those items.

However, neither defendant has claimed ownership of the items found in the trap, nor made any showing that they knew of the existence of the trap or its contents. Consequently, defendants have not demonstrated a legitimate expectation of privacy in the items found in the hallway trap. *See Cody*, 434 F. Supp. 2d at 167 (holding that refusal to claim ownership of an item or place results in a lack of standing to object to a search of that item or place); *see also Torres,* 949 F.2d at 608 ("Neither possession nor ownership of property established a legitimate expectation of privacy unless the party vigilantly protects the right to exclude others."); *cf. Gudema*, 163 F.3d at 722 (collecting cases in which courts held that even an ownership interest is not enough to demonstrate a legitimate expectation of privacy). Because defendants had no legitimate expectation of privacy in the trap or its contents, they cannot suppress the use of such evidence at trial. *See Padilla*, 508 U.S. at 81; *Paynor*, 447 U.S. at 731. Accordingly, defendants' motions to suppress the cocaine and cash found inside the trap are denied.

## 2. Consent

Defendants next argue that the results of the search of the residence and the truck must be suppressed because (1) neither defendant

gave valid consent to the search, and (2) the totality of the circumstances leading up to the consent, if any, was so coercive that any consent must be invalidated. For the reasons that follow, the Court rejects these arguments.

### a. Legal Standard

Once a defendant with a reasonable expectation of privacy in the area searched challenges a warrantless search as unreasonable under the Fourth Amendment, the burden is on the government to demonstrate that the search was within one of the recognized exceptions to the warrant requirement. *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993). One such exception to the warrant requirement is a search conducted on consent, in that an individual's consent to a search renders it reasonable. *See Snype*, 441 F.3d at 130-31 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973) and *United States v. Lewis*, 386 F.3d 475, 481 (2d Cir. 2004)); *United States v. Yu-Leung*, 910 F.2d 33, 40-41 (1990) (citing *Schneckloth*, 412 U.S. at 219). Furthermore, it is well-established that, where there are multiple individuals within a dwelling, the consent of one occupant with authority to give such consent is sufficient to justify the search of the shared premises. *See United States v. Matlock*, 415 U.S. 164, 170 (1974) ("[T]he consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared.").

Where the government asserts that an individual consented to a search, the government bears the burden of proving, by a preponderance of the evidence, that the consent was voluntary. *United States v.*

4

*Isiofia*, 370 F.3d 226, 230-31 (2d Cir. 2004). Voluntariness is ascertained by an analysis of the totality of the circumstances surrounding the consent. *Id.* at 231; *see also Yu-Leung*, 910 F.2d at 41.

In determining whether consent was voluntarily given, courts look to the following non-exhaustive list of factors, including: 1) the youth, lack of education, or low intelligence of the defendant; 2) the lack of any advice as to the defendant's constitutional rights; 3) the length of detention; 4) the repeated and prolonged nature of the questioning; and 5) the use of physical punishment such as the deprivation of food or sleep. *See Schneckloth*, 412 U.S. at 226 (citations omitted). "Other relevant factors include whether guns were drawn or whether the 'consenting' adult was threatened." *United States v. Lopez*, No. 97 Cr. 483 (RPP), 1997 WL 790582, at *6 (S.D.N.Y. Dec. 24, 1997) (citing *United States v. Monsalve*, 728 F. Supp. 212, 218 (S.D.N.Y. 1990)). The Second Circuit has stated that "the concept of knowing and intelligent waiver, which is strictly applied to rights involving a fair criminal trial, does not govern in the Fourth Amendment context." *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). Thus, consent need not be knowing and intelligent; "[s]o long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." *Id.* (citing *Schneckloth*, 412 U.S. at 228). Similarly, knowledge of the right to refuse consent is not a requirement to a finding of voluntariness, though it may be a factor in ascertaining whether the consent was coerced. *Garcia*, 56 F.3d at 422-23 (citations omitted).

While more than a "mere acquiescence in a show of authority" is necessary to establish that consent was voluntarily given, *United States v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993), "the fact that a person is in custody or has been subjected to a display of force does not automatically preclude a finding of voluntariness." *Snype*, 441 F.3d at 131 (citing *United States v. Ansaldi*, 372 F.3d 118, 129 (2d Cir. 2004) (holding that use of guns to effectuate arrest and handcuffing of defendant did not render his consent to search his home involuntary)); *see also United States v. Crespo*, 834 F.2d 267, 271 (2d Cir. 1987) ("That [the defendant] was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion."). Indeed, consent to a search has been held to be valid where six federal agents were present in the home and the individual was told that the agents would stay there until a warrant was obtained. *See Yu-Leung*, 910 F.2d at 41; *see also United States v. Calvente*, 722 F.2d 1019, 1023-24 (2d Cir. 1983) (consent deemed valid where an individual was told that the officers could obtain a warrant).

Additionally, in order to determine the scope of the action authorized by a consent, courts employ an objective test. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *see also Garcia*, 56 F.3d at 423 (quoting *Jimeno*). An analysis of objective reasonableness is governed by the "totality of the circumstances" standard. *Garcia*, 56 F.3d at 423. If a court finds that, under the

5

totality of the circumstances, it was "objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken]," there is no Fourth Amendment violation. *Garcia*, 56 F.3d at 423 (quoting *Jimeno*, 500 U.S. at 249) (alteration in original).

b. Analysis

For the reasons that follow, the Court finds that the consent given by Peña Ontiveros to search the residence and the truck was valid, and declines to suppress the evidence recovered therein.

(1) The Search of the Residence

The following facts were elicited at the evidentiary hearing. At approximately 3:00 a.m., following a positive alert given by a trained K-9 unit, and after calling in a marked NYPD unit, the agents decided to approach the residence and conduct a "knock and talk" in order to attempt to obtain consent to search the truck and the residence. (Tr. at 21, 66-67, 105, 272, 274.) The agents who approached the house were dressed in plain clothes, wearing bulletproof vests, some with their badges visible. (Tr. at 23, 51-52, 106-07, 221, 335.) None of the agents present at the residence had their guns drawn at any point.[1] (Tr. at 23-24, 51-52, 70, 107, 198, 224, 275.) Some of the agents knocked on the front door, repeatedly announcing their presence in both English and Spanish. (Tr. at 23-24, 107-08,

209, 275, 278.) Agent Marin testified that she was saying things like, "Police, open, please open the door" in Spanish while others were speaking in English. (Tr. at 24.) Some agents also walked to the back of the house and knocked on the back door and windows, using batons and flashlights. (Tr. at 107-08, 209-10, 281.) One of the agents who was at the back of the residence at this time testified that the agents could see through an air conditioning vent that there was an individual in the back bedroom in bed hiding under the covers. (Tr. at 281-84.) The agents tried to communicate with the individual, but he did not respond. (*Id.*)

After the agents had been knocking for approximately 20 minutes, defendant Peña Ontiveros opened the front door. (Tr. at 24, 109, 284.) Agent Marin, who spoke Spanish, first asked Peña Ontiveros if he spoke English, and Peña Ontiveros responded that he did.[2] (Tr. at 23, 47.) Agent Marin then asked Peña Ontiveros in English why he had not answered, given the knocking and verbal inquiries by the agents. (Tr. at 25, 48, 286.) Peña Ontiveros answered that "his friend" had told him not to answer. (Tr. at 25, 50, 286-88.) Agent Marin then asked Peña Ontiveros whether the agents could enter the residence, whereupon Peña Ontiveros replied, "Yes." (Tr. at 25, 50, 286-88.) Agent Marin and other agents then entered the residence. (Tr. at 289-90.) According to the agents who testified, no guns were drawn at any time, and no one was swearing or cursing. (Tr. at 51, 54-55, 70, 107, 287.) Agent Marin also testified that she never heard anyone from

---

[1] Agent Stowers and Agent Johnson both testified that there was one agent across the street who had a "long arm" rifle that was out and visible, unlike the handguns which were not drawn. (Tr. at 226-27, 275.)

[2] Peña Ontiveros does not dispute that he speaks English.

6

inside the residence say that the agents could not come in. (Tr. at 46.)

After Agent Marin and the other agents entered the residence, Agent Marin asked Peña Ontiveros in English if there was anyone else in the residence, and he said yes. (Tr. at 25.) At the same time, other agents conducted a protective sweep of the residence. (Tr. at 72-74, 289-90.) Agent Johnson went directly to the back bedroom, where he found defendant Rico Beltran, whom he had previously seen under the covers in bed. (Tr. at 289-90.) Agent Johnson told Rico Beltran to stay on the bed at that point. (Tr. at 289-92.) He testified that his gun was not drawn. (Tr. at 295.)

Agent Marin testified that, during her conversation with Peña Ontiveros after the agents entered the residence, she asked him, in English, for consent to search the residence. (Tr. at 25, 54.) He provided consent, also in English. (Id.) Agent Marin did not ask for written consent, as she did not have any forms with her for the defendant to sign to provide written consent. (Tr. at 55-56.) She then asked Peña Ontiveros to sit down in the living room. (Tr. at 69.)

The Court finds that, based on the totality of the circumstances, the consent given by Peña Ontiveros to enter and subsequently search the residence was validly obtained. First, the Court credits the testimony of the agents, who were wholly credible and consistent in describing the events leading up to the consent and search. In crediting the agents' testimony, the Court expressly rejects the assertions set forth by defendants in their affidavits, which were not subject to cross-examination because the defendants did not

testify. *See United States v. Fuentes*, No. 07 Cr. 329 (SHS), 2007 WL 2319142, at *4 (S.D.N.Y. Aug. 10, 2007) (crediting the testimony of testifying witnesses over the sworn statement of the defendant regarding whether he gave consent); *United States v. Juliano*, No. 99 Cr. 1197 (AGS), 2000 WL 1206745, at *3 n.1 (S.D.N.Y. Aug. 24, 2000) (affording less weight to conclusory affidavit submitted by defendant where the court could not assess the defendant's credibility due to his decision not to testify, and the testimony of the government's witnesses was "forthright and truthful"); *see also United States v. Frank*, 8 F. Supp. 2d 284, 291 n.2 (S.D.N.Y. May 6, 1998); *United States v. Rodriguez*, No. 92 Cr. 452 (KMW), 1993 WL 78060, at *2 (S.D.N.Y. Mar. 16, 1993).

Specifically, in his affidavit, Peña Ontiveros asserts that "[t]he agents tricked me and my co-defendant into letting one of the female agents into the apartment." (Peña Ontiveros Aff. at 1.) Peña Ontiveros also claims in his affidavit that the agents entered the residence with guns drawn. (Id.) Similarly, Rico Beltran contends in his affidavit that the agents were "yelling and threatening" and that he and Peña Ontiveros "repeatedly denied" the agents' requests to enter the residence until a female agent asked to use the bathroom, at which point Peña Ontiveros unlocked and opened the front door. (Rico Beltran Aff. at 1.) He also asserts that the agents entered "brandishing automatic machine guns and other service weapons" and that the "dark of night and unfamiliar surroundings created an atmosphere of fear and intimidation." (Id. at 2.) These assertions lack credibility in light of the other evidence and testimony introduced at the hearing. Indeed, defendants would have the Court

believe that they repeatedly denied the agents entry to the residence, despite threats, displays of force, and disruptive behavior, only to then allow them inside based on an agent's request to use the restroom. This scenario strains credulity, and was all but abandoned at the hearing, at which defendants' counsel made no inquiry whatsoever on this point during cross-examination. Accordingly, the Court credits the testimony of the agents over the conflicting allegations in defendants' affidavits.

Second, the Court finds that the totality of the circumstances demonstrates that the consent given by Peña Ontiveros was voluntary. Their uncorroborated assertions aside, defendants point to several undisputed facts — including that the knock and talk was done in the middle of the night and lasted for 20 minutes — in arguing that the consent given by Peña Ontiveros was not voluntary but rather a mere acquiescence to authority, which cannot form the basis for valid consent. (Peña Ontiveros Mem. at 9-12; Rico Beltran Mem. at 6-7.) However, the hearing firmly established that Peña Ontiveros is a middle-aged man who speaks English, was not in custody at the time of the consent, and faced no questioning prior to the consent being given. No guns were drawn. Nor was Peña Ontiveros subjected to any physical punishment or threats. The Court credits the testimony of Agent Marin and Agent Stowers, who both stated that Peña Ontiveros was calm during their interactions with him. (Tr. at 28, 235.) The circumstances surrounding the consent thus do not weigh in favor of a finding of involuntariness. *See Yu-Leung*, 910 F.2d at 41 (holding that consent was valid despite the presence of six federal agents and the statement that the agents would stay there until a warrant was obtained); *United States v. Sanchez*, 635 F.2d 47, 60 (2d Cir. 1980) ("It is true that several officers were present, but there is no indication that the circumstances were inherently coercive. Both [individuals] were calm and relaxed."); *United States v. Ramirez*, 903 F. Supp. 587, 591 (1995) (finding no coercion even where guns drawn for a short time); *cf. United States v. Amry*, No. 02 Cr. 612 (DLC), 2003 WL 124678, at *4 (S.D.N.Y. Jan. 16, 2003) (finding that an arrest at 7:00 a.m. was not coercive).

Finally, defendants' arguments relating to the agents' infringement on the "curtilage" of the residence are meritless. Defendants assert that the consent to the search was somehow tainted or invalid because the agents entered the property through an unlocked gate for the purpose of knocking on the doors and windows of the residence. (Peña Ontiveros Supp. Mem. at 3-5; Rico Beltran Supp. Mem. at 2-4.) Yet the Second Circuit has expressly rejected this proposition, noting that "[t]he route which any visitor to a residence would use is not private in the Fourth Amendment sense." *United States v. Reyes,* 283 F.3d 446, 465 (2d Cir. 2002); *see also United States v. Titemore,* 437 F.3d 251, 259-60 (2d Cir. 2006) (holding defendant did not have reasonable expectation of privacy in the porch and track of lawn that trooper used to reach stairway); *Serby v. Town of Hempstead,* No. 04 Civ. 901 (DRH) (MLO), 2006 WL 2853869, at *8 (E.D.N.Y. Sept. 30, 2006) ("Plaintiff cannot claim a reasonable expectation of privacy on the walkway or driveway that leads to his door or the unlocked screen door before the inner door to his house."). In so doing, the Second Circuit has joined other circuit courts in finding that the defendant's reasonable expectation of

privacy, rather than determinations of what constitutes "curtilage," is controlling. *See Titemore,* 437 F.3d at 260 n.3 (collecting cases). "Generally, the police are free to observe whatever may be seen from a place where they are entitled to be." *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997) (citing *Florida v. Riley,* 488 U.S. 445, 449 (1989)).

Here, the testimony at the hearing established that the agents approached the residence for purposes of knocking on the front door to gain consent to search the interior of the residence and the truck. (Tr. at 21, 66-67, 105, 272, 274.) The agents also went around the side of the building on a walkway that led to the back of the house, in order to knock on the back door and windows. (*Id*. at 107-08, 209-10, 281.) At the hearing, there was some disputed testimony as to whether the agents had to open an unlocked gate in order to approach the residence. (*Id.* at 81-82, 198, 271.) However, even assuming *arguendo* that the agents unlatched an unlocked gate to get to the front and/or back of the house, this action was no more intrusive than that which would be taken by anyone who wished to ring the doorbell or knock on the door of the residence. *See Serby,* 2006 WL 2853869, at *8. Thus, because defendants cannot claim a reasonable expectation of privacy in these areas, the agents' presence in these areas was permissible, and defendants' arguments related to the "curtilage" are rejected as meritless. *See Reyes,* 283 F.3d at 465; *Titemore,* 437 F.3d at 259-60.[3]

---

[3] Defendants also assert that some agents went around the back to knock on the back door and windows, and that they moved the side panel of an air conditioner in

Based on the totality of the circumstances, the Court finds that Pena Ontiveros's consent to search the residence was voluntary. Accordingly, defendants' motion to suppress the physical evidence seized from the residence is denied.

### (2) The Search of the Truck

Peña Ontiveros also moves to suppress the cocaine found in the truck after it was seized by the ICE agents and searched at a facility in Newark.[4] Specifically, Peña Ontiveros asserts in his affidavit that the agents forced him to sign a consent form when he was in custody at the ICE office. (*See* Peña Ontiveros Aff. at 2.) For the reasons stated below, the motion is denied.

---

one of the back windows in order to get a better view into the room. (*See* Tr. at 107-08, 209-10, 281-84). Although it is unclear from the testimony whether the agents could see Rico Beltran without having to touch the air conditioner (*id*. at 281-82), the Court finds that such an observation would have been permissible in any event. *See Fields*, 113 F.3d at 321. Even assuming *arguendo* that the agents saw Rico Beltran only after moving the air conditioner, defendants have not articulated how the observation of Rico Beltran in his bed requires suppression of the items recovered in the search.

[4] Rico Beltran has made no claim of ownership of the truck, nor any showing that he had a reasonable expectation of privacy in the truck. Thus, he has not shown a privacy interest in the truck sufficient to allow him to move for suppression of its contents. *See Carter*, 525 U.S. at 87-88; *see also Rakas*, 439 U.S. at 41 (holding that a passenger in a car cannot assert the protection of the Fourth Amendment against the seizure of evidence he did not own). At oral argument, counsel for Rico Beltran explicitly disclaimed his client's ownership of the truck and clarified that Rico Beltran is not joining in the motion to suppress the evidence found in the truck. (*See* Transcript of February 7, 2008 Oral Argument ("Feb. 7 Tr.") at 72-73.)

As discussed above, the government bears the burden of proving, by a preponderance of the evidence, that the defendant's consent to search the truck was voluntarily given, based on the totality of the circumstances. *Isiofia*, 370 F.3d at 230-31; *see also Yu-Leung*, 910 F.2d at 41; *Garcia*, 56 F.3d at 422. At the hearing, Agent Lee testified that shortly after defendants' arrest at the residence, Peña Ontiveros told him, in English, that the truck contained no guns, drugs, or money, and that he (Agent Lee) could search the truck. (Tr. at 111-12.) Furthermore, Agent Lee testified that, later that morning, at the ICE Office *before* the truck was transported to an off-site location to be searched, Peña Ontiveros signed a written consent form allowing the agents to search the truck. (Tr. at 119-20; *see also* Gov't Ex. 3.) There is certainly nothing in the record to suggest that the circumstances surrounding the consent were coercive in any way. Indeed, Peña Ontiveros points to no facts to the contrary, other than his own uncorroborated, conclusory statements that he was forced to consent to the search. (*See* Peña Ontiveros Aff. at 2.)

The Court credits the testimony of Agent Lee and finds that Peña Ontiveros provided a voluntary oral consent to search the truck while at the residence,[5] and that he later executed a voluntary written consent to search the truck after he had been transported to the ICE office. Peña Ontiveros's arguments that he was coerced into signing the consent form

_____

[5] Peña Ontiveros did not address the issue of whether he gave oral consent to the search of the truck, either in his papers or his affidavit. The Court finds, in crediting the testimony of Agent Lee, that the oral consent given at the residence was alone sufficient to justify the search of the truck, regardless of the written consent obtained later in the day.

are belied by the evidence in the record. *See, e.g.*, *Crespo*, 834 F.2d at 271. Accordingly, the motion to suppress the cocaine found in the truck is denied.

### B. Suppression of Statements

Each defendant seeks to suppress statements given to the agents, both at the residence and at the ICE Office, on two grounds: first, that they did not voluntarily waive their *Miranda* rights, and second, that they did not voluntarily waive their rights to a speedy presentment. The Court shall address each of the statements in turn.

#### 1. Statements at the Residence

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), law enforcement officers must apprise defendants of their rights pursuant to the Fifth Amendment's privilege against self incrimination during custodial interrogations. Once the warnings are given, a suspect who invokes his right to counsel may not be questioned by law enforcement officers unless the suspect initiates the conversation. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981). However, it is well-established that an individual may waive his or her *Miranda* rights and may be questioned after doing so. *Id.* The government bears the burden of demonstrating, by a preponderance of the evidence, that there has been a valid waiver. *Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986).

"To prove a valid waiver, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving that right." *United States v. Jaswal*,

47 F.3d 539, 542 (2d Cir. 1995) (citing *Moran v. Burbine,* 475 U.S. 412, 421 (1986)). The waiver must be knowing, voluntary, and intelligent in order to be valid, a determination of which "depends in each case upon the particular facts and circumstances surrounding that case including the background, experience and conduct of the accused." *Id.* (citations and internal quotations omitted); *see also Miranda*, 384 U.S. at 467-73.

### a. Defendant Peña Ontiveros

The testimony at the hearing established that Peña Ontiveros, who speaks English, waived his *Miranda* rights, both orally and in written form, at the residence. Agent Lee testified that after he arrested Peña Ontiveros, he read the *Miranda* rights to Peña Ontiveros in English from the *Miranda* form, and that Peña Ontiveros orally waived his *Miranda* rights in English, and signed the written *Miranda* consent form. (Tr. at 115-17; *see also* Gov't Ex. 10.) As discussed above, no guns were drawn, and the agents did not engage in threatening or abusive behavior. Moreover, contrary to the assertions of Peña Ontiveros, each of the agents testified that Peña Ontiveros never requested to speak to a lawyer. (Tr. at 28, 129, 151, 170, 172, 174-75, 236, 251, 325, 327, 345.) The Court credits the agents' testimony and finds that the initial *Miranda* waiver executed by Peña Ontiveros at the residence was valid. The motion to suppress any statements made by Peña Ontiveros at the residence is therefore denied.

### b. Defendant Rico Beltran

With respect to Rico Beltran, the Court finds that the government has not satisfied its burden of demonstrating that the *Miranda* waiver obtained at the residence was valid. First, although Agent Stowers and Detective Martinez testified that Rico Beltran was advised of his rights in Spanish, indicated that he understood his rights, and orally waived them (*see* Tr. at 202-03, 318, 331), the testimony of Detective Martinez raised significant doubts as to his ability to accurately translate basic words found on the *Miranda* waiver form. (Tr. at 328-31.) Nor was there sufficient evidence from which to conclude that Rico Beltran understood his rights or that he made a knowing and voluntary waiver of his rights at the residence. Although both Agent Lee and Agent Stowers testified that they witnessed Rico Beltran speaking English at some point (Tr. at 118-19, 122, 132, 196, 205-07), there is no dispute that the agents felt it necessary to use a Spanish-speaking officer, Detective Martinez, to assist in interpreting for the agents who questioned Rico Beltran at the residence. Nor is there any evidence in the record to suggest that the agents attempted to advise Rico Beltran of his rights in English, or that Rico Beltran understood English to the extent necessary to comprehend the relative complexity of the waiver of rights he was being asked to make. Since it is the government's burden to establish that the defendant's waiver was knowing and voluntary, the ambiguities in the record are fatal to the government's argument here.

Second, the undisputed evidence at the hearing demonstrates that Rico Beltran refused to sign the written waiver of his

*Miranda* rights at the residence. (*See* Gov't Ex. 9; Tr. at 218.) Agent Stowers testified that when an individual makes an oral waiver, but refuses to sign a written waiver, his usual practice is to make a notation of "waived orally" or "will not sign, waived orally." (Tr. at 215-17.) However, in this case, the only notation on the form was "refused to sign." (*See* Gov't Ex. 9.)

Taken as a whole, these facts are insufficient to show either that Rico Beltran voluntarily relinquished his *Miranda* rights, or that he "had a full awareness of the right being waived and of the consequences of waiving that right." *Jaswal*, 47 F.3d at 542. Accordingly, the Court finds that the government has not met its burden, and the motion of Rico Beltran is granted with regard to the statements he made at the residence.[6]

### 2. Statements Made at the ICE Office

Defendants likewise move to suppress the statements given by defendants at the ICE Office on the evening of July 23, 2007, on the grounds that their *Miranda* waivers were not validly obtained. Alternatively, defendants

challenge the admissibility of those statements on the ground that the government violated defendants' rights to a speedy presentment under Fed. R. Crim. P. 5 and 18 U.S.C. § 3501(c). For the reasons set forth below, the Court finds that the delay in presenting defendants before a magistrate judge was unreasonable and that defendants' statements at the ICE Office must be suppressed. Accordingly, the Court need not address the voluntariness of the *Miranda* waivers.

#### a. The Right to Speedy Presentment

Section 3501(c) provides that a court may, in its discretion, exclude a defendant's statements to law enforcement officials upon a finding that the defendant was held by law enforcement for more than six hours without being presented before a magistrate judge, where the delay in presenting the defendant was unreasonable.[7] *United States v. Perez*, 733 F.2d 1026, 1035 (2d Cir. 1984). This section comports with Rule 5(a) of the Federal Rules of Criminal Procedure, which

---

[6] Agent Lee testified that he briefly interviewed Rico Beltran at the ICE Office in the early morning hours of July 23, 2008, and referenced notes that he took containing certain statements that Rico Beltran made during that interview. (Tr. at 117-19; *see* Gov't Ex. 3501-A (notes of Agent Lee, not introduced as evidence but used to reflect his recollection at the hearing).) The parties have not briefed the issue of whether these statements are admissible. However, since there was no testimony to suggest that Rico Beltran was separately *Mirandized* at that time, and since the Court has concluded that the earlier waiver of rights allegedly made by Rico Beltran at the residence was inadequate, the Court concludes that the statements made by Rico Beltran at the ICE Office in the morning must also be suppressed.

[7] The statute provides: "In any criminal prosecution by the United States . . . a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate judge . . . if such confession is found by the magistrate judge to be voluntary and if the weight to be given to the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before a magistrate judge . . . is found by the judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate . . . ." 18 U.S.C. § 3501(c).

requires that "[a] person making an arrest within the United States must take the defendant without unnecessary delay before a magistrate judge. . . ." *See United States v. Berkovich*, 932 F. Supp. 582, 587-88 (S.D.N.Y. 1996). Under § 3501(c), a finding of unreasonable delay in excess of six hours may itself justify suppression, regardless of whether the statement was otherwise voluntary. *See Perez*, 733 F.2d at 1035.[8]

Neither the Supreme Court nor the Second Circuit has held that a delay of over six hours alone requires suppression. *See United States v. Alvarez-Sanchez*, 511 U.S. 350, 356 (1994); *Perez*, 733 F.2d at 1030.

[8] The enactment of 18 U.S.C. § 3501(c) codified a long-standing Supreme Court doctrine known as the *McNabb-Mallory* rule. *See McNabb v. United States,* 318 U.S. 332, 341 (1943); *Mallory v. United States,* 354 U.S. 449, 455 (1957). The *McNabb-Mallory* doctrine established an exclusionary rule applicable to statements made after the government "unnecessarily" delayed arraignment, in accordance with Rule 5 of the Federal Rules of Civil Procedure. *See id.* Although the Supreme Court has since struck down subsections (a) and (b) of § 3501 to the extent Congress attempted to legislatively overrule *Miranda*, *see Dickerson v. United States*, 530 U.S. 428, 444 (2000), the *McNabb-Mallory* rule, as modified by § 3501(c), remains good law. *See, e.g.*, *United States v. Mansoori*, 304 F.3d 635, 660-61 (7th Cir. 2002) (applying § 3501(c) post-*Dickerson*); *United States v. Spruill*, 296 F.3d 580, 590 (7th Cir. 2002) (same); *United States v. Gamez*, 301 F.3d 1138, 1143 (9th Cir. 2002) (same); *United States v. Boyd*, No. 01-2041, 31 Fed. Appx. 601, 604 n.3 (10th Cir. 2002) (unpublished) ("Nothing in *Dickerson* overrules or affects the time limitation specified in subsection (c) of § 3501(c)."); *United States v. Dubogryzov*, No. 06 Cr. 233 (AHN), 2007 WL 2904215, at *4-5 (D. Conn. Oct. 1, 2007) (same); *United States v. Lopez*, No. 05 Cr. 655 (SLT), 2006 WL 1455455, at *5 (E.D.N.Y. May 25, 2006) (same); *see also United States v. Stankovic*, No. 05 Cr. 667 (PHX), 2006 WL 3469511, at *5 n.7 (D. Ariz. Nov. 30, 2006) ("Nothing in *Dickerson* challenges the validity of § 3501(c).").

However, "discretion is vested in a district court judge to exclude a confession upon his finding that a delay of more than six hours was not reasonable." *Perez*, 733 F.2d at 1035; *see also United States v. Fullwood*, 86 F.3d 27, 31 (2d Cir. 1996). Delays attributable to routine processing, transportation, overnight lodging, and a defendant's cooperation with authorities have all been found by courts in the Second Circuit to be reasonable or "excludable" under § 3501(c) or its predecessor, the *McNabb-Mallory* rule (discussed *supra* at footnote 9). *See United States v. Rubio,* 709 F.2d 146, 154 (2d Cir. 1983) (overnight lodging); *United States v. Collins*, 462 F.2d 792, 796 (2d Cir. 1972) (routine processing and transit); *Berkovich*, 932 F. Supp. at 588-89 (cooperation); *United States v. Gomez,* 758 F. Supp. 145, 152 (S.D.N.Y. 1991) (routine processing and overnight lodging); *Lopez*, 2006 WL 1455455, at *5 (processing, transit and overnight lodging); *United States v. Haouari*, No. 00 Cr. 15 (JFK), 2000 WL 1593345, at *7 (S.D.N.Y. Oct. 25, 2000) (processing and transit); *United States v. Ospina,* No. 99 Cr. 73 (AGS), 2000 WL 37997, at *2 (S.D.N.Y. Jan. 18, 2000) (processing, lodging and transit).

Examples of delay found to be unreasonable include delay solely attributable to the government's desire to investigate other crimes, and the government's claim that it lacked resources to effectuate the presentment where there were "six or more" agents assigned to the case. *See Perez*, 733 F.2d at 1036; *United States v. Rivera*, 750 F. Supp. 614, 620 (S.D.N.Y. 1990) ("A prearraignment interview commenced 16 hours after the defendant's arrest cannot be considered reasonable."); *see also United States v.*

13

*Wilson,* 838 F.2d 1081, 1087 (9th Cir. 1988) (holding that the "desire of the officers to complete the interrogation is, perhaps, the most unreasonable excuse possible under § 3501(c)").

Of course, a defendant may also waive his or her right to be presented promptly. *See Berkovich,* 932 F. Supp. at 588 (citing *United States v. Markoneti,* No. 92 Cr. 169 (JBW), 1993 WL 180355, at *2 (E.D.N.Y. May 25, 1993) and *United States v. Pham,* 815 F. Supp. 1325, 1331 (N.D. Cal. 1993)). However, in such cases it is the government's burden to prove, by a preponderance of the evidence, a knowing and voluntary waiver of the right to a speedy presentment. *See Berkovich,* 932 F. Supp. at 588; *see Colorado v. Connelly,* 479 U.S. 157, 168 (1986).

b. Analysis

(1) Waiver

The government asserts that "[e]ach defendant was separately advised of his right to speedy presentment . . . and each defendant voluntarily, knowingly and intelligently waived his right both orally and in writing." (Gov't Supp. Br. at 13.) In support of this argument, the government points to the testimony of Agent Lee, who testified that, at approximately 2:00 or 3:00 p.m. on July 23, 2007 (Tr. at 124), while waiting at the ICE Office for the results of the truck search, he advised each defendant of his right to a speedy presentment, and obtained waivers from each defendant.[9]  His testimony was as follows:

---

[9] According to Agent Lee, Agent Alfonso was also present during these exchanges. (Tr. at 122.)  Agent Alfonso did not testify at the hearing.

Q: Did you ultimately hear from either Special Agent Herbert or Special Agent Herbst regarding the results of the truck search in Newark?

A: Yes.

Q: At approximately what time that day?

A: Approximately 4 to 5, 5 to 6 p.m.

Q: Before that, while waiting for the results from the truck search, did you speak with either or both of the defendants again?

A: Yes.

Q: Please describe first – well, please describe what you spoke to them about.

A:  I spoke to each defendant individually.  I advised them that they have the right to speedy presentment, which is to be presented today in court, and I gave them a form which they needed to sign if they wanted to waive their presentment in court today.

\*        \*        \*

Q: Did you explain their right to speedy presentment in English or in Spanish?

A: In English.

Q: With respect to both defendants[?]

A: Yes.

Q: What was the response of both defendants regarding the right to speedy presentment?

A: They both indicated that they wished to waive that and they signed the form.

(Tr. at 121-22.)

Agent Lee then testified that he gave each defendant a form to sign, which he mistakenly thought was a waiver of speedy presentment form. (Tr. at 122-24.) In fact, the forms were not waivers of *speedy* presentment, but waivers of presentment *in the nearest judicial district*. (Tr. at 124-25.) Nevertheless, defendants signed the forms, which were witnessed by Agent Lee and Agent Alfonso but did not reflect the time at which they were signed. (Tr. at 123-24.)

As an initial matter, the Court credits the testimony of Agent Lee, and rejects the assertions of the defendants as set forth in their affidavits, namely, that they were "forced to sign a 'waiver of speedy presentment' by the agents" and that they were misled into believing that they would be "set free within hours" if they signed the document. (Pena Ontiveros Aff. at 2; Rico Beltran Aff. at 3). The Court agrees with the government that there was no evidence introduced at the hearing to support a finding of "any type of coercion" on the part of the agents. (Feb. 7 Tr. at 99). Nevertheless, even accepting the testimony of Agent Lee, the Court finds that there is insufficient evidence in the record from which to conclude that defendants voluntarily, knowingly, and

intelligently waived their rights to speedy presentment in a timely manner.

First, and most importantly, it is undisputed that Agent Lee did not even raise the issue of speedy presentment with defendants until 2:00 or 3:00 in the afternoon — approximately 10 to 11 hours after their arrest at the residence and well beyond the six-hour time period required by § 3501(c). (Tr. 124, 190.) Thus, it appears that the waivers — whether oral or in writing — were not timely. Although the government did not even address this fact in its briefs or at oral argument, the Court is aware of no authority to suggest that a defendant may make a valid waiver of his right to speedy presentment more than four hours *after* the statutorily-prescribed six-hour time period has expired.

Moreover, even if such an untimely waiver were permissible — a doubtful proposition, at best — the facts adduced at the hearing do not support a finding that defendants knowingly consented to a waiver of their speedy presentment rights. For example, although the government asserts that "[e]ach defendant was separately advised of his right to speedy presentment . . . and each defendant voluntarily, knowingly and intelligently waived his right . . . in writing" (Gov't Supp. Br. at 13), it is undisputed that the forms signed by defendants were not waiver of speedy presentment forms, but forms relating to waiver of presentment in the nearest judicial district. (Tr. at 124-25.) Thus, the written waivers, invalid on their face, raise serious doubts as to whether defendants ever understood the rights at issue, much less manifested an intent to waive those rights.

15

Furthermore, the evidence supporting the government's suggestion that defendants "orally" waived their rights to speedy presentment *before* receiving and reviewing the erroneous waiver forms is, at best, ambiguous on the record before the Court. Specifically, Agent Lee testified that he advised defendants "that they have the right to speedy presentment, which is to be presented today in court," and that he "gave them a form which they needed to sign if they wanted to waive their presentment in court today." (Tr. at 122). When asked later in the examination "[w]hat was the response of both defendants regarding the right to speedy presentment," Agent Lee testified that "[t]hey both indicated that they wished to waive that and they signed the form." (Tr. at 122). This testimony is hardly conclusive as to whether defendants' consent was manifested orally before reviewing the form, orally after reviewing the form, or in writing after reviewing the form. Such distinctions are obviously significant, since the documents provided to defendants were not actually waiver of speedy presentment forms, but rather forms relating to a waiver of presentment in the nearest judicial district — a wholly distinct and separate right under Rule 5.

Later in the direct examination, the government attempted to resolve this ambiguity by asking a leading question: "After each defendant waived orally, I believe you testified that you then asked them to provide a written waiver." Although arguably not a fair characterization of the prior testimony, Agent Lee nevertheless answered, "Yes," suggesting that each defendant had made an oral waiver *after* hearing Agent Lee's description of the right to speedy presentment but *before* receiving or reviewing

the erroneous (and potentially confusing) waiver form. However, Agent Lee's subsequent testimony in response to a question from the Court only created further confusion concerning the existence of a knowing and intelligent waiver of speedy presentment:

> Q: With respect to the waiver of speedy presentment, what did you say to [Pena Ontiveros], as best you can recall, about his right to a speedy presentment and what he was waiving by giving that up?
>
> A: I told Mr. Pena that he was under arrest. He knew he was at that point. I told him he has a right to see a judge today, to be presented in front of a court today. If he chooses not to be, if he wishes to waive that, *he needs to indicate by signing this form*, which is waiving him from going to court today, which is he won't be presented today.

(Tr. at 184) (emphasis added). On cross-examination, Agent Lee put a finer point on the matter when he testified: "In my mind I had a waiver *once he signed the form*." (Tr. at 146) (emphasis added).

Put simply, the testimony from Agent Lee — the lone witness on the issue — was at best ambiguous as to whether the defendants believed they were consenting to the waiver of their right to speedy presentment, as orally summarized by Agent Lee, or their right to presentment in the nearest judicial district, as summarized in the written document signed by the defendants. Since the government bears the burden of proving that defendants

16

knowingly and intelligently waived their right to speedy presentment, this ambiguity is fatal. There simply is not sufficient evidence in the record from which to conclude either that defendants made an oral waiver of speedy presentment, or that the written consent was intended to waive rights other than those set forth in the document itself. [10]

For all these reasons, the Court cannot find that defendants' waivers of speedy presentment were timely, voluntary, knowing, and intelligent. Accordingly, the admissibility of defendants' statements at the ICE offices must turn on an assessment of whether "the delay . . . beyond the six-hour

---

[10] The findings above relate to both defendants. However, the Court notes that there is another basis on which to conclude that the government has failed to meet its burden with respect to defendant Rico Beltran. Put simply, although Agent Lee testified that he advised defendants of their rights to speedy presentment in English, the government did not adequately establish at the hearing that defendant Rico Beltran speaks and comprehends English at a level sufficient to understand the waiver of speedy presentment and to intelligently make such a waiver.  To the contrary, the record reflects that Rico Beltran was given *Miranda* warnings at least twice in Spanish, and questioned at least twice in Spanish, with the use of a Spanish interpreter — including approximately 6 to 7 hours *after* Agent Lee spoke to him in English about his right to speedy presentment.  (*See* Tr. at 205, 248-53, 320, 322.) Although some of the testimony at the hearing indicated that Rico Beltran was able to speak and understand *some* English (*see* Tr. at 118-19, 122, 132, 196, 205-07), the extent or quality of Rico Beltran's English language skills was never adequately developed during the hearing. *Cf. United States v. Toney*, 579 F. Supp. 652, 655 (S.D.N.Y. 1984) (recounting the "careful" manner in which the government established defendant's language skills and the validity of his waiver of rights).  Since it is the government's burden to demonstrate that Rico Beltran knowingly and intelligently waived his right to a speedy presentment, this failure provides an additional reason to reject the validity of his waiver of speedy presentment.

---

period" was "reasonable" under 18 U.S.C. § 3501(c).

### (2)  Reasonable Delay

In the absence of a valid waiver, the Court must address whether the delay in presenting defendants before a magistrate judge was "reasonable" under the circumstances. Defendants claim that the delay was unreasonable. (*See* Rico Beltran Supp. Mem. at 7-8; Pena Ontiveros Supp. Mem. at 15.) The government counters that the delay was reasonable given the "totality of the circumstances," including the fact that the agents were attempting to complete the investigation of their case, and that the agents thought they had valid waivers of speedy presentment at the time they recommended questioning of the defendants later that evening. (*See* Feb. 7 Tr. at 91-92, 97-98.)

For the following reasons, the Court finds that the delay was not reasonable under the circumstances, and that the statements given by defendants on the evening of July 23, 2007 must be suppressed.

As an initial matter, the government asserts that "given all of the circumstances, including waiting on the search [of] the truck, . . . understanding who the drugs and the cash belonged to, and understanding what was happening here, . . . it was not unreasonable [for agents] to wait that day and have [defendants] brought down and presented the following morning." (Feb. 7 Tr. at 91). Indeed, the government concedes that the delay in presenting defendants was "primarily" due to the fact "that the agents were waiting on the result of the search of the truck and that that search did not conclude

17

until 6:00" in the evening. (*Id.* at 89; *see also id.* at 91-92 ("as soon as the 7 or 8 kilograms of drugs were found in the truck at Newark, the agents immediately began interviewing defendant Ontiveros about that, and that was clearly one of the issues, or the *primary* issue that they were awaiting, as well as getting an understanding of sort of how all this fit together") (emphasis added); Tr. at 146 ("Q: Then why didn't you [present defendant to court that day]? A: Because we were still conducting an exam of the truck.").)

The Second Circuit has clearly recognized that the agents' desire to conduct further investigation does not constitute a reasonable basis for delay under § 3501(c). In *United States v. Perez*, the court held that "the AUSAs and DEA agents' desire to investigate other crimes is not a legitimate excuse for their failure to respect [defendant's] right for a prompt arraignment." 733 F.2d at 1036. The court further noted that "[e]ven if it were, . . . the government, with its available manpower, could have both secured the codefendant's apartment and presented [defendant] to a magistrate in a prompt manner." *Id.*; *see also United States v. Rubio*, 709 F.2d 146, 154 (2d Cir. 1983) (delay can be used to "deny the defendant the right to a prompt arraignment" as well as for coercive interrogation); *United States v. Marrero*, 450 F.2d 373, 379 (2d Cir. 1971) (Friendly, J., concurring); *Wilson,* 838 F.2d at 1087 ("[T]he desire of the officers to complete the interrogation is, perhaps, the most unreasonable excuse possible under § 3501(c)").

Here, the government does not argue, nor can it, that the delays in defendants' speedy presentment were attributable to a shortage of agent manpower occasioned by the need to pursue other investigative leads. To the contrary, it is undisputed that defendants were in custody at the ICE offices in Manhattan from approximately 6:00 a.m. Monday morning until late into the evening. (Tr. at 117, 258, 261). There was clearly no shortage of agents who could have transported defendants to court, a mere 20 minutes away, for presentment. (Tr. at 133.) Indeed, the Court takes judicial notice of the fact that the ICE office in Manhattan is the largest in the country, with several hundred law enforcement officers assigned there.

The government's remaining argument is that the agents were acting in good faith, in reliance on what they thought were valid waivers, in failing to present defendants before a magistrate judge within six hours of their arrest. (Feb. 7 Tr. at 97-98.) The government has cited no authority, and the Court has not found any, supporting the notion that, because the agents were acting on a good faith belief that there was a waiver, the delay was "reasonable" under § 3501(c). To the contrary, the express language of § 3501(c) states that "the time limitation contained in this subsection shall not apply in any case in which the delay . . . is found by the trial judge to be reasonable *considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge or other officer*" (emphasis added). Clearly, the situation at hand does not involve a delay that was attributable to circumstances beyond the agents' control, or delays inherent in transportation and processing. Rather, the delay was the direct result of the agents' failure to even consider defendants' rights by either transporting defendants to the courthouse — no more than a few miles away — or procuring a valid and

18

timely waiver of the right to speedy presentment.

While Agent Herbert testified at the hearing that he believed that valid waivers had been obtained (*see* Tr. at 261), that belief was clearly erroneous. As noted above, Agent Lee did not even attempt to obtain defendants' consent to waive speedy presentment until 2:00 or 3:00 in the afternoon — approximately 10 to 11 hours after their arrest at the residence. The fact that this breakdown was not communicated to the agents who actually interrogated the defendants is of no moment and cannot be used to salvage a failure that was completely avoidable and entirely within the control of "the law enforcement agency" responsible for the arrest and detention. 18 U.S.C. § 3501(c). To suggest otherwise would be to reduce the right to speedy presentment to a mere empty shell.

Moreover, the mere absence of bad faith on the part of the agents is not enough to render their otherwise impermissible delay "reasonable." Indeed, although the Court does not dispute the government's assertion that "there was no indication of any bad faith" on the part of the agents, and nothing to suggest that the agents had engaged in a "calculated attempt to do an end run around the waiver of speedy presentment" (Feb. 7 Tr. at 97), the fact remains that the agents' approach to defendants' constitutional and statutory right of speedy presentment was decidedly casual and marked by a carelessness that was anything but "reasonable" under the circumstances. Our system of justice requires that criminal defendants be afforded certain rights, among them the right to be brought before a judicial

officer within six hours of their arrest. Although the six-hour rule is not rigid, and may be tempered by a district court in its discretion as to the reasonableness of certain delays, there is nothing in the facts of this case to suggest that the delay in presenting defendants was unavoidable or otherwise attributable to anything other than the agents' failure to understand and abide by the requirements of § 3501(c) and Rule 5. For these reasons, the Court cannot condone the delays that resulted in defendants being interrogated more than 15 to 18 hours after their arrest in this case.

Indeed, the facts underlying *Perez* are particularly enlightening in this regard. In that case, as set forth in the district court opinion of Judge Edward Weinfeld, the defendant Perez was arrested on a Friday at approximately 3:25 p.m., and "was taken forthwith to the office of the Drug Enforcement Administration," where he was "processed – finger-printed, strip-searched, and photographed – and his arrest record was obtained." *United States v. Toney*, 579 F.Supp. 652, 654 (S.D.N.Y. 1984). Although the "processing was completed at approximately 4:45 or 5:00 p.m., Perez was then held in a cell at the DEA office until approximately 10:00 p.m.," while the agents applied for and ultimately executed a warrant to search the home of Perez's co-defendant. *Id.* Thereafter, at approximately 11:20 p.m., Perez was subsequently interviewed, whereupon he was *Mirandized* and then proceeded to make inculpatory statements. *Id.*

In considering Perez's motion to suppress, Judge Weinfeld concluded that "[u]pon the facts presented, any statements made by Perez

. . . must be suppressed because of unnecessary and unreasonable delay in taking him before the Magistrate." *Id.* at 655. Specifically, Judge Weinfeld found that:

> At 5:00, when Perez had been fully processed at the DEA office, a Magistrate was available to arraign him and advise him of his rights as specified by Fed. R. Crim. P. 5(c). Indeed, the hearing established that the Magistrate remained on duty until 6:25 p.m., in connection with another matter. . . . The argument that delay was necessary in order to obtain the search warrant . . . and to effect the arrest of other co-defendants does not wash. Perez' right to a reasonably prompt arraignment cannot be subordinated to serve the convenience of the agents in seeking and processing other alleged culprits. Neither is the alleged "shortage of manpower" an excuse.

*Id.* On the basis of these findings, Judge Weinfeld suppressed the statements, concluding that "[t]here is no adequate explanation for the delay in taking Perez before the Magistrate." *Id.*

If anything, the facts involved in the instant case are more egregious than those in *Perez*. For example, whereas the defendant in *Perez* was arrested at 3:30 in the afternoon, defendants here were arrested between 3:00 and 4:00 in the morning. Moreover, whereas the agents in *Perez* had at most a 90-minute window in which to present Perez before a magistrate judge, the agents in the instant case could have brought defendants to court for presentment at *any* time during the course of

the day. Finally, and most importantly, whereas Perez was detained for approximately 8 hours before his subsequent interrogation, defendants here had been in custody for 15 to 18 hours before making inculpatory statements at the ICE office. On the basis of these facts, the Court can find no reason to reach a result different from the one reached by Judge Weinfeld.

Nor do the provisions of § 3501(d) preclude suppression of defendants' statements. Section 3501(d) provides that "[n]othing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person *without interrogation by anyone* . . . ." 18 U.S.C. § 3501(d) (emphasis added). This provision "is designed to ensure that the statute not exclude incriminating statements unconnected with the delay in arraignment," including voluntary or spontaneous statements given without interrogation. *United States v. Colon*, 835 F.2d 27, 30 (2d Cir. 1987); *see also Fullwood*, 86 F.3d at 31. At least one court in this District has applied § 3501(d) after finding an unreasonable period of delay under § 3501(c) and determined that "a setting where the defendant was read his rights and then interviewed does not qualify as an absence of interrogation so as to come within the provisions of § 3501(d)." *Rivera*, 750 F. Supp. at 621 (S.D.N.Y. 1990). Such is the situation here. At the time the statements were given, Rico Beltran had been in custody for approximately 18 hours, after having been roused from his bed at 3:00 a.m. the previous morning. Peña Ontiveros likewise had been in custody for approximately 15 hours. There is no question that the statements made by defendants that evening were in the context of

20

an interrogation — indeed, the agents testified that they waited until after the results of the search of the truck were obtained before again approaching defendants, *Mirandizing* them, and then taking their confessions. (Tr. at 121, 125-29, 248-61.) As such, the Court finds that the delay was unreasonable, and that the statements were not given "without interrogation" so as to bring them within the purview of § 3501(d).

Accordingly, the Court in its discretion finds that the delay in defendants' presentment was not reasonable, and that defendants' statements to law enforcement agents on the evening of July 23, 2007 must be suppressed pursuant to 18 U.S.C. § 3501(c) and Rule 5.

## III. CONCLUSION

In accordance with the foregoing, the motions of defendants Peña Ontiveros and Rico Beltran are GRANTED in part, and DENIED in part. Defendants' motion to suppress evidence recovered from the residence and the truck are denied. Peña Ontiveros's motion to suppress statements made at the residence is denied; Rico Beltran's motion to suppress statements made at the residence is granted. Defendants' motions to suppress the statements given at the ICE Office on the evening of July 23, 2007 are granted. The Clerk of the Court is directed to terminate the motions docketed as

document numbers 21, 22, 23, and 31.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: April 9, 2008
New York, New York

\*   \*   \*

The United States of America is represented in this matter by Assistant United States Attorney Brendan McGuire, Esq., and Assistant United States Attorney Michael English, Esq., United States Attorney's Office, One Saint Andrew's Plaza, New York, New York, 10007. Defendant Carlos Peña Ontiveros is represented by Cristobal Miguel Galindo, Esq., Galindo P.C., 2714 Louisiana, Suite 200, Houston, Texas 77002. Defendant Silvestre Rico Beltran is represented by Carlos A. Garcia, Esq., The Law Office of Carlos A. Garcia, 1305 East Griffin Parkway, Mission, Texas 78572.